UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FIRESTONE ART LLC, d/b/a Eric Firestone, | No. |
| *Plaintiff*, | **DEFENDANTS'** |
| - against - | **NOTICE OF REMOVAL** |
| TOKIO MARINE HIGHLAND INSURANCE SERVICES, INC. d/b/a Tokio Marine Highland, Fine Art Division; PHILADELPHIA INDEMNITY INSURANCE COMPANY a Tokio Marine Company, and DOES 1-10, | |
| *Defendants.* | |

Defendants Tokio Marine Highland Insurance Services, Inc. ("Tokio Marine") and Philadelphia Indemnity Insurance Company (the sole named defendants in this action) hereby remove the civil action bearing Index No. 652490/2024 from the Supreme Court of the State of New York, County of New York (the "State Court Action"), to the United States District Court for the Southern District of New York pursuant to 28 U.S.C. §§ 1332, 1446, and Loc. Civ. R. 81.1.

1.     Plaintiff Firestone Art LLC ("Plaintiff" or "Firestone Art") commenced this action in the Supreme Court of the State of New York, County of New York by filing a Summons and Complaint on or about 2024-May-14 (the "Complaint"). A copy of the Complaint is attached hereto as **Exhibit A**, without admission or adoption.

2.      The Defendants have not yet been served with process in this case. The date of this Notice of Removal is therefore *ipso facto* within 30 days of the date of service.

3.      The Complaint represents that Firestone Art is a New York limited liability company with a principal place of business in New York City. (Complaint ¶ 16 On information and belief, Eric Firestone, the member of Firestone Art, also resides in New York State.

4.      The Complaint alleges accurately that Philadelphia Indemnity is a Pennsylvania corporation with a principal place of business at 231 St. Asaph's Road, Suite 100, Bala Cynwyd, PA 19004. (Complaint ¶ 13.)

5.      The Complaint alleges accurately that Tokio Marine is a California corporation. (Complaint ¶ 12.) The Complaint does not identify a principal place of business. In fact, as stated in the printout from the New York State Secretary of State database annexed as Exhibit B, its principal place of business is at 625 Fair Oaks Avenue, South Pasadena, CA 91030.

6.      Accordingly, there is complete diversity between the Plaintiff and the Defendants.

7.      The Complaint (¶ 70) alleges that Plaintiff has been damaged in an amount not less than $7 million.

8.      Plaintiff's demand for relief means that, for jurisdictional purposes, the amount in controversy exceeds the threshold of $75,000 dictated by § 1332(a). Pursuant

to 28 U.S.C. § 1446(c)(2) ("If removal of a civil action is sought on the basis of the

jurisdiction conferred by section 1332(a), the sum demanded in good faith in the initial

pleading shall be deemed to be the amount in controversy . . .")

9.      Accordingly, there is complete diversity between the parties, and the

amount in controversy exceeds $75,000, meaning that this Court has diversity

jurisdiction over this action, and removal is proper under 28 U.S.C. § 1441.

10.     Pursuant to 28 U.S.C. § 1446(a) this Notice of Removal is filed in the

United States District Court for the Southern District of New York, which is the District

in which the State Court Action is pending.

11.     This Notice of Removal is timely because it is being filed within 30 days

after the Complaint was filed.

12.     Defendants will file on this date a copy of the Notice of Removal with the

Clerk's Office of the Supreme Court of the State of New York, County of New York, as

required by 28 U.S.C. § 1446(d).

13.     Plaintiffs will give written notice on this date to Plaintiff of the filing of this

Notice of Removal as required by 28 U.S.C. § 1446(d).

14.     In accordance with FED. R. CIV. P. 81(c)(2)(A), Live Art will answer or move

with respect to the Complaint within 21 days after being served with process.

**WHEREFORE**, Defendants respectfully requests that the above-titled Action now pending in the Supreme Court of the State of New York, County of New York, be removed from there to this Court.

Dated: 2024-May-16

**ART**x**LAW** PLLC

By: */s/ Ronald W. Adelman*

John R. Cahill
Ronald W. Adelman
8 North Front Street
Kingston, NY 12401
john@artxlaw.com
ron@artxlaw.com
Tel. 212-719-4400

*Attorneys for Defendants*

MAZZOLA LINDSTROM LLP
1350 Avenue of the Americas
New York, New York 10019
646.216.8300
*Attorneys for Plaintiff*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------------X
FIRESTONE ART, LLC d/b/a ERIC FIRESTONE,

               Plaintiff,                       Index No.:

     -against-                            **Summons**

TOKIO MARINE HIGHLAND INSURANCE
SERVICES, INC. d/b/a Tokio Marine Highland, Fine Art
Division, PHILADELPHIA INDEMNITY
INSURANCE COMPANY a Tokio Marine Company,
and DOES 1-10,

               Defendants.
-------------------------------------------------------------------X

To:    Tokio Marine Highland Insurance Services, Inc.
       d/b/a Tokio Marine Highland, Fine Art Division
       1221 Avenue of the Americas
       New York, New York 10020

       Philadelphia Indemnity Insurance Company
       a Tokio Marine Company
       231 St. Asaph's Road, Suite 100
       Bala Cynwyd, PA 19004

     You are hereby summoned to answer the complaint in this action and to serve a copy of

your answer, or, if the complaint is not served with this summons, to serve a notice of

appearance, on plaintiff's attorneys within 20 days after the service of this summons, exclusive of

the day of service (or within 30 days after the service is complete if this summons is not

personally delivered to you within the State of New York); and in case of your failure to appear

or answer, judgment will be taken against you by default for the relief demanded in the

1

complaint. Plaintiff designates the Supreme Court of the State of New York, County of New York as the place of trial. The basis of venue in New York County is that plaintiff maintains offices in the county at 4 Great Jones Street, New York, NY 10012.

Dated:   New York, New York
         May 14, 2024

MAZZOLA LINDSTROM, LLP

By:   *Wendy J. Lindstrom*
      Wendy J. Lindstrom
      Hanoch Sheps
      Katie O'Leary
      1350 Avenue of the Americas, 2nd Floor
      New York, New York 10019
      646.216.8300
      *Attorneys for Plaintiff*
      wendy@mazzolalindstrom.com
      hanoch@mazzolalindstrom.com
      katie@mazzolalindstrom.com

2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------------X
FIRESTONE ART, LLC d/b/a ERIC FIRESTONE,

                 Plaintiff,                 Index No.:

      -against-                 **Declaratory Judgment Complaint**

TOKIO MARINE HIGHLAND INSURANCE
SERVICES, INC. d/b/a Tokio Marine Highland, Fine Art
Division, PHILADELPHIA INDEMNITY
INSURANCE COMPANY a Tokio Marine Company,
and DOES 1-10,

                 Defendants.
-------------------------------------------------------------------X

       Plaintiff Firestone Art, LLC d/b/a Eric Firestone ("Firestone"), by and through its attorneys, Mazzola Lindstrom LLP, as and for their complaint against defendants Tokio Marine Highland Insurance Services, Inc. d/b/a Tokio Marine Highland, Fine Art Division ("Tokio Marine Highland"), Philadelphia Indemnity Insurance Company a Tokio Marine Company ("Philadelphia Indemnity") and Does 1-10 ("Does"), alleges on knowledge with respect to itself and its own conduct and on information and belief as to all other matters as follows:

### Nature of the Action

      1.     This is an action for declaratory judgment and other relief to determine the respective obligations, relationships, and responsibilities of defendants in connection with insurance coverage and resulting from the property damage claimed by plaintiff believed to be in excess of $7 million, with the precise amount to be determined at the time of trial.

      2.     Plaintiff is a well-known fine art gallery with exhibition spaces in New York City and Easthampton, NY, mounting exhibitions across the globe. In addition to selling its own

3

valuable inventory, plaintiff sells artworks that are on consignment from owners, artists and artists'

estates. Plaintiff's clientele includes several prominent collectors and art institutions.

3.       Tokio Marine Highland and Philadelphia Indemnity are in the business of providing

insurance coverage.

4.       Plaintiff purchased a fine art dealers insurance policy from Tokio Marine Highland

covering the period between April 15, 2022 to April 15, 2023 under policy number PCFA-000033-

01 (the "Firestone Policy"). This policy provided insurance coverage for "all risks" to the artworks

owned by or consigned to plaintiff. Philadelphia Indemnity underwrote the policy.

5.       Plaintiff seeks a declaration that Tokio Marine Highland and/or Philadelphia

Indemnity have a duty to indemnify plaintiff for its insurance claim under the Firestone Policy.

6.       Plaintiff incurred substantial damage to more than two hundred fifty artworks after

pipes burst on the floor above plaintiff's storage space, causing flooding and extensive water

damage to the artwork and the storage space. As a result, many artworks are total losses, many

others require conservation and will nonetheless incur losses in value.

7.       Plaintiff's insurer, be it Tokio Marine Highland and/or Philadelphia Indemnity, is

contractually obligated under the Firestone Policy to indemnify plaintiff for this loss, including for

the value of works of art that are a total loss and for the diminished value of works of art that can

be conserved, and to reimburse plaintiff for costs incurred and those to be incurred as a result of

the damage.

8.       Plaintiff has repeatedly demanded reimbursement for the losses incurred to date,

for the replacement value of the works of art deemed a total loss, for conservation costs already

incurred and to be incurred for other works of art, and for the loss in value of those damaged works

of art which are not total losses.

Case 1:24-cv-03772-JPC   Document 1   Filed 05/16/24   Page 9 of 24

9.     Tokio Marine Highland and/or Philadelphia Indemnity have failed or refused to reimburse or otherwise indemnify or compensate plaintiff for its losses, which at this time are estimated to exceed $7 million, with the precise amount to be determined at the time of trial.

10.    As a result of Tokio Marine Highland and/or Philadelphia Indemnity's refusal to perform and satisfy its obligations to plaintiff, plaintiff has and will continue to suffer damages, has prevented critically necessary conservation, prevents plaintiff from returning consigned artworks, as well as sold artworks, and is preventing plaintiff from exhibiting or lending artworks to others. Tokio Marine Highland and/or Philadelphia Indemnity's actions and inactions have caused and will continue to cause incalculable damages to plaintiff, including reputational harm.

11.    The **Loss Settlement** provision of the Firestone Policy states:

**LOSS SETTLEMENT**

In the event of "loss", Covered Property will be settled as follows. The most we will pay for total or partial "loss" per "occurrence" is the maximum Limit of Insurance as shown in the Declarations:

**1. Total Loss**

For total "loss", the most we will pay are the following amounts:

**a.** Your Covered Property at cost plus 30% or selling price less 20%, whichever greater at time of "loss".
**b.** The value of Covered Property consigned to you will be the lowest agreed amount on the consignment agreement plus 10%.
**c.** The value of Covered Property of others in your care, custody and control, but not on consignment, will be the amount agreed upon between you and the lender prior to loss, as per written agreement. In the absence of a written agreement, the maximum value for the item will be "current market value".
**d.** Covered Property sold but not delivered, and/or while in transit to consignee's or owner's premises will be valued at the selling price plus expenses, if any, which have accrued from the date of sale.
**e.** Objects of art jointly owned are valued as stated on the agreement with the co-owner(s), up to the interest of the Named Insured.
**f.** Reference library, reference material, furniture and fixtures as described including electronic data processing equipment and "data and media", if covered, are valued at "replacement value".

5

**g.** Any Covered Property not described above will be valued at "current market value".

In the event of total "loss", you will surrender the property to us.

### 2. Partial Loss

For partial "loss", we agree to pay you an amount mutually agreed upon based on the following: We agree to pay you an amount based on the cost and expense of restoration of the item as nearly as possible to its condition immediately before the "loss", including any additional charges associated with such restoration. Loss in value, if any, after restoration, is covered and will be agreed upon between you and us.

### 3. Pair or Set

In the event of "loss" to an item which is part of a pair or set:

**a.** A total loss may be paid, at your option, and in so doing the remaining property will be forfeited to us as salvage; or
**b.** A partial loss may be paid, and the measure of "loss" shall be a reasonable and fair proportion of the total value of the pair or set, giving consideration to the importance of the item to the pair or set.

### <u>Parties</u>

12.     Tokio Marine Highland is incorporated in the State of California, is in the business of providing insurance coverage with places of business in New York City and One Bala Plaza, Suite 100 and Bala Cynwyd, PA 19004, and is an insurance company authorized to sell and issue insurance policies in the State of New York. Tokio Marine Highland is a wholly owned company of Tokio Marine Kiln Group Limited, one of the largest carriers in the Lloyd's of London insurance market.[1]

---

[1] To the extent a proper defendant is also Tokio Marine Specialty Insurance Company, Tokio Marine Specialty is a wholly-owned subsidiary of the Philadelphia Consolidated Holding Corporation, a Pennsylvania-domiciled insurance company, which itself is a wholly-owned subsidiary of Tokio Marine North America, Inc. Tokio Marine North America, Inc. is a Delaware domiciled insurance holding company that is a wholly-owned subsidiary of Tokio Marine & Nichido Fire Insurance Company, Ltd., a privately held insurance company organized under the Companies Act of Japan. Tokio Marine & Nichido Fire Insurance Company, Ltd. is a subsidiary of Tokio Marine Holdings, Inc., an insurance holding company organized under the Companies Act of Japan.

6

13.     Philadelphia Indemnity[2] is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania with its principal place of business located at 231 St. Asaph's Road, Suite 100, Bala Cynwyd, PA 19004. At all times relevant hereto, it was duly authorized to sell and issue insurance policies in the State of New York.

14.     Tokio Marine Highland and Philadelphia Indemnity are both directly named in the Firestone Policy and plaintiff cannot yet articulate with specificity what contractual arrangements may exist as and between those parties or what common law duties may arise as regards defense and indemnity for plaintiff's claim. Given that they are affiliated entities, and both named in the Firestone Policy, it is premature to delineate which actions alleged herein were carried out by either Tokio Marine Highland or Philadelphia Indemnity. Tokio Marine Highland, Philadelphia Indemnity, Does 1 through 10, inclusive, on and for themselves and certain other parents, affiliates and subsidiaries to be determined, are therefore collectively referred to herein as "defendants".

15.     Plaintiff is unaware of the true names and capacities, whether individual, corporate, associate or otherwise, of defendants Does 1 through 10, inclusive, or any of them, and therefore sues these defendants, and each of them, by such fictitious names. Plaintiff will seek leave of court to amend this Complaint when the identities of these defendants are ascertained.

16.     Plaintiff, a New York corporation, is an art gallery in the business of buying and selling fine artworks and its principal place of business is located in New York, NY.

17.     At all times relevant times, defendants insured plaintiff pursuant to the Firestone Policy.

---

[2] According to its website, "Philadelphia Insurance Companies is the marketing name for the insurance company subsidiaries of the Philadelphia Consolidated Holding Corp., a Member of the Tokio Marine Group."

## Jurisdiction and Venue

18.     Jurisdiction is conferred upon this Court by N.Y. C.P.L.R. § 301 as defendants are domiciliaries of New York and under N.Y. C.P.L.R. § 302 because, among other things, defendants regularly do business in New York, transact business within the State of New York, including business directly related to the damaged art at issue and insurance coverage regarding the damaged art at issue, upon information or belief own, use or possess real property in New York, and committed tortious acts in New York.

19.     Venue in this Court is proper pursuant to N.Y. C.P.L.R. § 503 because defendants have offices in New York County and a substantial part of the events and omissions occurred in the county, and the damaged property was located in the county.

## Factual Background

20.     Plaintiff maintains an art gallery in a multi-story commercial property at 4 Great Jones Street, New York, New York 10012 (the "premises") where many works of fine art are both exhibited and stored.

21.     On or about February 4, 2023, a baseboard radiation piping system located in a second-floor space not controlled, maintained or accessible by plaintiff froze, causing the pipes to burst and causing significant flooding of the ground floor where plaintiff stored artworks, amongst other things.

22.     Plaintiff provided immediate and timely notice of the loss and submitted a claim via plaintiff's broker under the Firestone Policy to defendants.

23.     At the time of loss, approximately six hundred artworks worth millions of dollars were identified as potentially having been affected.

8

24.     Immediately after the loss, plaintiff took decisive steps to mitigate and prevent further damage. These steps included cooperating with defendants by facilitating relocation of affected artworks to a climate-controlled facility (to abate further damage) and coordinating with various fine art conservators to aid in assessing the scope of damage arising from sustained exposure to moisture and humidity.

25.     In subsequent weeks, plaintiff worked diligently to identify artworks that would require conservation, those needing priority attention and of high value, ruling out artworks which seemingly did not sustain damage in consultation with defendants, fine art conservators and clients (the latter being the "Returnable Art").

26.     Plaintiff repeatedly requested release of Returnable Art to avoid business interruptions, damages to plaintiff and reputational harm. In doing so, plaintiff could narrow the claim (and had the added benefit of reducing potential claim costs).

27.     In or about May 2023, defendants appointed an independent claim adjuster, Yorquest, Ltd. ("Yorquest").  Plaintiff's counsel and Yorquest arranged for Yorquest and a conservator appointed by defendants to inspect the artworks located at a fine art storage facility in New Jersey. These inspections unfortunately took *several* months to complete during which plaintiff made multiple attempts to have high priority and valuable items returned, including the Returnable Art.

28.     Plaintiff's release requests were repeatedly denied as a consequence of accounting and payment issues *solely* between defendants and the storage facility. Plaintiff was also forced to jump through administrative hoops to have the art released, absurd considering the artwork belonged to plaintiff or its clients.

9

29.     Over the next several months, plaintiff expended significant time and resources to respond to extensive record requests propounded by and through defendants' designated claims director, Colin Quinn, of Precise Adjustments, Inc., a wholly owned company of Tokio Marine Highland.

30.     Plaintiff provided voluminous records supporting its claim, including purchase and sale agreements, representation and consignment agreements, evidence of conditions prior to the loss, fine art conservator reports confirming the presence and nature of damages sustained, purchase, sales and valuation records, inventories – all while balancing a need to protect sensitive commercial and proprietary data and records which defendants seemingly could not appreciate, despite being a specialized fine art insurer.

31.     Plaintiff contemporaneously provided detailed lists of artworks which were damaged, those which would require conservation, and Returnable Art. This was and continues to be a sensitive and complex process because of the volume of artworks involved, comprised of various media: sculpture, photographs, works on paper, works on canvas, etc.; each media requires the expertise of different fine art conservators and appraisers.

32.     A joint inspection was finally conducted at the fine art storage facility housing the claimed property on August 18, 2023. The joint inspection was prompted, in part, by an inaccurate inventory produced by the fine art storage facility, and apparent misidentification and misplacement of several artworks.

33.     Plaintiff's staff was shocked to observe that artworks which were temporarily wrapped, packaged and transported from plaintiff's premises, then examined by a conservator retained by defendants, then repackaged to ensure the artworks were free of moisture had not in

10

fact been properly handled, risking exposure to and likely resulting in further damage to the artworks.

34.      Plaintiff would come to learn at the joint inspection that framed artworks had inexplicably not been properly examined, many artworks were not being properly stored or packaged, other artworks were labeled "to be restored" or "total losses" but stored among the "cleared" artworks and vice versa, artworks were misclassified (*e.g.*, many artworks were deemed undamaged, when upon further inspection, they clearly exhibited signs of water damage or certain artworks were marked to require conservation when they should have been deemed a total loss), many artworks with raised surfaces and textures were not contained in a shadow box and were found with other artworks leaned against them, creating noticeable denting and/or even tearing of the material in these artworks, loss of surface material, heavy artworks were stored haphazardly in bins on wheels, etc.

35.      It was not until plaintiff asked the art handlers at the facility about this lack of organization that it was claimed that the volume of the artworks being transported made it difficult to keep them organized. This is an unacceptable excuse from a fine art storage facility and follows months of inspections, examinations, and visits to the facility by defendants and its agents and demonstrates defendants' failure to properly advise the fine art facility or insist on corrective action.

36.      On September 14 2023, plaintiff, through counsel, outlined in correspondence to defendants several corrective measures that would need to be taken and self-evident issues with the documentation produced by defendants to plaintiff, further delaying resolution of the claim.

37.      However, it would take several more months to complete key adjustment tasks like reconciling the inventory issues at the storage facility. On several occasions, plaintiff and its

counsel would have to advise defendants of prior conversations and disclosures to correct mistakes in lists being provided to plaintiff.

38.     Each time plaintiff provided information demonstrating that the artworks suffered loss or damage, defendants requested more information and forced plaintiff to incur more unnecessary expenses in responding to the additional requests for information, and incurred additional and unnecessary expenses of conducting supplemental supervised inspections due to defendants' mishandling of the initial inspection.

39.     To respond to defendants' voluminous and unreasonable requests for information, plaintiff expended significant monies and time of its principal and senior employees that would have otherwise been spent on its business.

40.     On January 18, 2024, plaintiff, its counsel, Mr. Quinn, Yorquest and the defendants' conservator attended a meeting to outline a process to finalize adjustment of the claim. Plaintiff came prepared with its counsel, principal and senior staff members to discuss each and every affected artwork and potential resolution of the claim.

41.     At that meeting, plaintiff also offered to have its principal sit for an examination under oath; Mr. Quinn advised that this would not be necessary.

42.     Frustratingly, defendants failed to present any offer on, at a minimum, those items over whose classification there was no dispute. Plaintiff also learned that defendants' appointed conservator had *still* not inspected several pieces, despite having had *months* of unfettered access to the artworks at the fine art storage facility, and that consolidated inventories were still unavailable. The additional inspections would necessitate commitment of additional resources by plaintiff to attend, primarily to streamline and insure defendants' conservator's completion of her inspections.

12

43.     Nevertheless, clear and concise goals were outlined and agreed upon which included release of the Returnable Art to plaintiff, a protocol for inspecting Returnable Art to confirm their condition, inspection of additional items, conservation and treatment proposals and potential resolution.

44.     Additional inspections were conducted on January 26 during which plaintiff identified artworks requiring priority attention in terms of receiving treatment proposals as they were either sold artworks or where a consignor was inquiring about the status.

45.     After inspections were finally completed, plaintiff confirmed that more than two hundred artworks would need to be conserved, approximately forty additional artworks deemed total losses, and nearly six hundred pieces of Returnable Art.

46.     Plaintiff continued to provide all relevant records and documentation involved in the claim as requested by defendants and Yorquest.

47.     Defendants indicated that plaintiff could liaise directly with the storage facility to arrange return of the Returnable Art. Plaintiff did so on several occasions, repeatedly committing resources to retrieve the artwork and personnel to facilitate this release, to the detriment of its ongoing business operations.

48.     Plaintiff repeatedly was advised and secured confirmation from defendants and the storage facility that the Returnable Art would be released, again committing plaintiff's resources to retrieve the artwork and personnel to facilitate this release, to the detriment of its ongoing business operations, to say nothing of the fact that plaintiff had been without the valuable Returnable Art for a year by this point. Each time release arrangements were confirmed, they would be inexplicably and abruptly cancelled through no fault of plaintiff.

13

49.     In early February 2024, the storage facility advised plaintiff that it would no longer honor plaintiff's requests (including providing images of artworks and releasing Returnable Art) because of a substantial outstanding balance owed by defendants. Defendants failed to make payment until February 21, 2024.

50.     Incredulously, and belatedly, on April 9, 2024, defendants suggested that plaintiff pay the storage facility to release its own artworks and those of its clients. This was despite plaintiff's offer to send its art handlers to retrieve and transport the artwork at plaintiff's cost and expense.

51.     Defendants have refused to pay the storage facility for the costs attendant to releasing the Returnable Art, thus depriving plaintiff of the superior right of possession, as owner, and custody, as consignee or bailee, resulting in incalculable damages to plaintiff that continue to accrue and substantial reputational harm.

52.     This has also resulted in critical delays to conserving artwork and may have resulted in additional damage, and continues to delay return of consigned property, committed institutional loans.

53.     Because of defendants' unjustified refusal to provide coverage and delays in handling the claim, plaintiff has incurred costs and additional damages.

54.     To date, defendants have failed to reimburse plaintiff for any of the costs plaintiff has incurred to repair and conserve damaged artwork, failed to reimburse plaintiff for artworks considered total losses, and failed to arrange, much less pay, for conservation of partially damaged artworks.

14

55.     At all times, plaintiff fully cooperated with defendants' investigation of the claim, provided defendants with all relevant requested information and documentation respecting plaintiff's claim under the Firestone Policy.

56.     Plaintiff is entitled to recover the full amount of its damages from defendants, currently estimated to exceed $7 million, with the precise amount to be determined at trial.

<u>**As and for a First Cause of Action**</u>
**(Defendants' Breach of Contract)**

57.     Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

58.     The Firestone Policy constitutes a valid contract of insurance and plaintiff has satisfied all obligations and complied with all conditions applicable under the Firestone Policy.

59.     In that regard, upon discovering the damage to the works of art at issue in this action, plaintiff immediately and timely notified defendants of plaintiff's claims regarding the damaged art at issue.

60.     All of the artwork for which coverage is now being sought is insured under the Firestone Policy.

61.     No exclusion in the Firestone Policy applies to exclude coverage for the loss or damage claimed by plaintiff.

62.     Based upon the terms and conditions of the Firestone Policy, because the loss or damage sustained by plaintiff is covered under the terms of the Firestone Policy, and is not otherwise excluded, defendants have an obligation to pay plaintiff the full amount of the claim as submitted.

63.     Plaintiff provided extensive supporting documentation information to defendants regarding all of the damaged works of art.

15

64.     Defendants did, or had a reasonable opportunity, to inspect all of the works of art at issue.

65.     Plaintiff has, at all times, complied with all of its obligations under the Firestone Policy and has satisfied its burden to establish that the claim is covered thereunder, or has been excused from compliance with such obligations as a result of defendants' breach and/or other conduct.

66.     The Firestone Policy's terms and conditions have thus been triggered, requiring defendants to provide insurance to plaintiff for its claimed losses.

67.     Specifically, pursuant to its contractual obligations owed to plaintiff as an insured under the Firestone Policy, defendants are required to reimburse plaintiff for all of plaintiff's claims for the costs they already incurred to repair certain portions of the damaged art, to reimburse plaintiff for the lost value of the works of art at issue caused by the damage at issue, to compensate plaintiff for the significant costs necessary to conserve the works of art that can be conserved, and to reimburse plaintiff for its losses resulting from certain works of art being unrepairable and, accordingly, a total loss. Despite plaintiff's repeated demands for reimbursement and compensation under the Firestone Policy, and despite defendants' contractual obligations to compensate plaintiff for its losses, defendants have dragged their feet for many months and to date have failed and refused to reasonably compensate plaintiff for any of its losses, let alone the full amount of its losses.

68.     By unreasonably failing to compensate plaintiff for its losses covered by the Firestone Policy, defendants have breached their contractual obligations under the Firestone Policy.

69.     As a direct and proximate result of defendants' breach of contract, defendants have deprived plaintiff of the benefit of the insurance coverage for which premiums have been paid.

70.     As a result of defendants' breach of contract, plaintiff has suffered actual and compensatory damages in the amount of $7 million.

### As and for a Second Cause of Action
### (Declaratory Judgment)

71.     Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

72.     The Firestone Policy constitutes a valid contract of insurance and plaintiff has satisfied its obligations and complied with all conditions applicable thereunder.

73.     Because the parties have an actual and active controversy regarding their respective rights and obligations under the Firestone Policy, a declaratory judgment of the parties' respective rights and obligations is necessary.

74.     Plaintiff seeks a judgment declaring that, pursuant to its rights as insureds under the Firestone Policy, defendants are obligated to compensate plaintiff for the lost value of the works of art at issue caused by the damage at issue, the significant costs necessary to conserve and/or repair the works of art that can be conserved and/or repaired, and to reimburse plaintiff for its losses resulting from certain works of art being unrepairable, and, accordingly, a total loss.

### Prayer for Relief

WHEREFORE, Plaintiff respectfully requests judgment against defendants as follows:

(a)     An award to plaintiff for damages in the amount of at least $7 million on plaintiff's breach of contract cause of action against defendants Tokio Marine and Philadelphia Indemnity, on and for themselves and certain other parents, affiliates and subsidiaries to be determined, with the precise amount to be determined at trial.

17

(b)    A judgment declaring that, pursuant to plaintiff's rights as insured under the policy, defendants Tokio Marine and Philadelphia Indemnity, on and for themselves and certain other parents, affiliates and subsidiaries to be determined, are obligated to compensate plaintiff for the lost value of the works of art at issue caused by the damage at issue, the significant costs necessary to conserve and/or repair the works of art that can be conserved and/or repaired, and to reimburse plaintiff for its losses resulting from certain works of art being unrepairable and, accordingly, a total loss;

(c)    An award to plaintiff of its costs, disbursements, and reasonable attorneys' fees in this action, as well as pre- and post-judgment interest; and

(d)    For such other and further relief as the Court may deem just and proper.

Dated: New York, New York
           May 14, 2024

                                                    Mazzola Lindstrom, LLP

                                                    *Wendy J. Lindstrom*

                                    By:    Wendy J. Lindstrom
                                           Hanoch Sheps
                                           Katie O'Leary
                                           1350 Avenue of the Americas, 2nd Floor
                                           New York, New York 10019
                                           646.216.8300
                                           *Attorneys for Plaintiff*
                                           wendy@mazzolalindstrom.com
                                           hanoch@mazzolalindstrom.com
                                           katie@mazzolalindstrom.com

18

# Department of State
## Division of Corporations

## Entity Information

---

[ Return to Results ]  [ Return to Search ]

Entity Details

**ENTITY NAME:** TOKIO MARINE HIGHLAND INSURANCE SERVICES, INC.

**DOS ID:** 1549804

**FOREIGN LEGAL NAME:** WNC INSURANCE SERVICES, INC.

**FICTITIOUS NAME:** TOKIO MARINE HIGHLAND INSURANCE SERVICES, INC.

**ENTITY TYPE:** FOREIGN BUSINESS CORPORATION

**DURATION DATE/LATEST DATE OF DISSOLUTION:**

**SECTIONOF LAW:** 1304 BCL - BUSINESS CORPORATION LAW

**ENTITY STATUS:** ACTIVE

**DATE OF INITIAL DOS FILING:** 05/22/1991

**REASON FOR STATUS:**

**EFFECTIVE DATE INITIAL FILING:** 05/22/1991

**INACTIVE DATE:**

**FOREIGN FORMATION DATE:** 08/14/1975

**STATEMENT STATUS:** CURRENT

**COUNTY:** NEW YORK

**NEXT STATEMENT DUE DATE:** 05/31/2025

**JURISDICTION:** CALIFORNIA, UNITED STATES

**NFP CATEGORY:**

ENTITY DISPLAY     NAME HISTORY     FILING HISTORY     MERGER HISTORY     ASSUMED NAME HISTORY

Service of Process on the Secretary of State as Agent

**The Post Office address to which the Secretary of State shall mail a copy of any process against the corporation served upon the Secretary of State by personal delivery:**

**Name:** ART LEE

**Address:** 625 FAIR OAKS AVENUE, SUITE 290, SOUTH PASADENA, CA, UNITED STATES, 91030

**Electronic Service of Process on the Secretary of State as agent: Not Permitted**

Chief Executive Officer's Name and Address

**Name:** NORMAN HEINRICH

**Address:** 625 FAIR OAKS AVENUE, SUITE 290, SOUTH PASADENA, CA, UNITED STATES, 91030

Principal Executive Office Address

**Address:** 625 FAIR OAKS AVENUE, SUITE 290, SOUTH PASADENA, CA, UNITED STATES, 91030

Registered Agent Name and Address

**Name:**

1/2

**Address:**

Entity Primary Location Name and Address

**Name:**

**Address:**

Farmcorpflag

**Is The Entity A Farm Corporation:**  NO

Stock Information

| Share Value | Number Of Shares | Value Per Share |
|-------------|------------------|-----------------|