SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
---------------------------------------------X
FIRESTONE ART, LLC d/b/a ERIC FIRESTONE,

       Plaintiff,

-against-

TOKIO MARINE HIGHLAND INSURANCE
SERVICES, INC. d/b/a Tokio Marine Highland, Fine Art
Division, PHILADELPHIA INDEMNITY
INSURANCE COMPANY a Tokio Marine Company,
and DOES 1-10,

       Defendants.
---------------------------------------------X

Index No.: 652490/2024

**Affirmation in Support of Order to Show Cause for Immediate Relief**

I, Wendy J. Lindstrom, an attorney duly admitted to practice before the courts of the State of New York, affirm under penalty of perjury as follows:

1. I am an attorney with the Mazzola Lindstrom, LLP law firm, counsel for plaintiff Firestone Art, LLC, and I submit this affirmation, and accompanying memorandum of law, in support of plaintiff's motion for the relief set forth in the accompanying order to show cause.

2. On May 14, 2024, plaintiff Firestone filed a declaratory judgment complaint (annexed hereto as Exhibit "A") for the captioned matter alleging breach of contract and requesting a judgment declaring that defendants are obligated to compensate Firestone for the value of the works of certain artworks that are a total loss, and for the costs necessary to conserve or repair other artworks that are not a total loss and to return certain artworks.

### Introduction

3. This motion is brought by order to show cause because defendants, who are in possession of Firestone's artworks – specifically, the artworks deemed by Firestone to be total

1

losses and others that can be conserved or repaired – intends to transport them from the New York metropolitan area[1] to Chicago. It is Firestone's position that (a) any conservation or repair can be performed in New York City, which is, of course, an art center, with the most highly skilled art conservators; and (b) transporting the artworks to Chicago greatly increases the risk of further damage to the artworks. An immediate restraint is urged to avoid unnecessary damage to plaintiff's property. It is evident that defendants wish to transfer the artworks to Chicago for conservation and repair because they can save money; however, since this would both greatly increase the risk of further damage to the artworks in transit, and unduly burden the plaintiff, who would have to expend great resources to monitor the progress of conservation themselves, and cause plaintiff's clientele to do the same, while expending additional resources to send appraisers to Chicago to assess the losses in value.

### Facts Germane to the Emergency Relief Sought

4. Plaintiff Firestone purchased a fine art dealer's insurance policy from Tokio Marine Highland covering the period between April 15, 2022 to April 15, 2023 under policy number PCFA-000033-01 (the "Firestone Policy"). This policy provided insurance coverage for "all risks" to the artworks owned by or consigned to plaintiff. Philadelphia Indemnity underwrote the policy.

5. On February 4, 2023, a baseboard radiation piping system located in a second-floor space at Firestone's gallery burst and flooded the premises, damaging hundreds of artworks, many being total losses, and many others requiring conservation and repair. Plaintiff immediately notified the defendants of the loss; the duty to cover the loss is not disputed.

---

[1] The artworks at issue are currently in storage just across the river in New Jersey.

6. Immediately after the flood, Firestone took steps to prevent further damage and mitigate loss, including working with the defendants to relocate affected artworks to a climate-controlled facility (to abate further damage) and coordinating with various fine art conservators to assess the damage. In subsequent weeks, and in consultation with defendants, fine art conservators and clients, Firestone worked diligently to identify artworks that would require conservation, and repeatedly requested their return, to minimize business interruptions and reputational harm.

7. In May 2023, the defendants appointed Yorquest, Ltd. to adjust the claim. Plaintiff's counsel arranged for Yorquest and a conservator appointed by defendants to inspect the artworks. These inspections unfortunately took *several* months to complete, during which plaintiff made multiple attempts to have high priority and valuable items returned.

8. Plaintiff's release requests were repeatedly denied as a consequence of accounting and payment issues *solely* between defendants and the storage facility. Plaintiff was also forced to jump through administrative hoops to have the art released, which is absurd because the artworks belong to plaintiff and its clients.

9. At a meeting attended by plaintiff, defendants and defendants' conservator on January 18, 2024, clear and concise goals were outlined and agreed upon: The artworks at issue would be released to plaintiff, a protocol was agreed to for inspecting the artworks to confirm their condition, conservation and treatment proposals and potential resolution.

10. Additional inspections were conducted on January 26 during which plaintiff identified artworks requiring priority attention in terms of receiving treatment proposals, as they were either sold artworks, or where a consignor was inquiring about the status.

3

11. After inspections were finally completed, plaintiff confirmed that more than two hundred artworks would need to be conserved, and about forty artworks were a total loss, and the undamaged works could be returned.

12. Defendants indicated that plaintiff could liaise directly with the storage facility to arrange return of the Returnable Art; i.e., the artworks that were undamaged or minimally damaged. Plaintiff did so on several occasions, repeatedly committing resources to retrieve the artwork and personnel to facilitate this release, to the detriment of its ongoing business operations. To aid defendants in the process, plaintiff even provided defendants with a list of qualified local conservators to which the works could be transferred and treated.

13. Plaintiff repeatedly was advised and secured confirmation from defendants and the storage facility that the Returnable Art would be released, again committing plaintiff's resources to retrieve the artwork and personnel to facilitate this release, to the detriment of its ongoing business operations, to say nothing of the fact that plaintiff had been without the valuable Returnable Art for a year by this point. Each time release arrangements were confirmed, they would be inexplicably and abruptly cancelled through no fault of plaintiff.

14. In early February 2024, the storage facility advised plaintiff that it would no longer honor plaintiff's requests (including providing images of artworks and releasing Returnable Art) because of a substantial outstanding balance *owed by the defendants*. Incredibly, on April 9, 2024, the defendants suggested that plaintiff pay the storage facility to release its own artworks and those of its clients, despite that the plaintiff had repeatedly offered to send its own art handlers to retrieve its artworks. Defendants' refusal to pay storage costs, has caused critical delays to conserving artwork and may have resulted in additional damage, and continues to delay return of consigned property.

15. On May 10, 2024, defendants notified plaintiff that it was "arranging for the expeditious shipment of all damaged artworks…to The Conservation Center in Chicago" more than 800 miles away, despite numerous qualified and capable conservators being located in the City of New York (Annexed hereto as Exhibit "B" is a copy of the letter dated May 10, 2024). Plaintiff expressly informed defendant that it "does not authorize the insurance company to transport any of these artworks," explaining its concern that the artworks could incur further damage during transit.

16. Despite this, defendants have insisted that the Conservation Center in Chicago is the "best suited…to treat the large number of damaged artworks efficiently and effectively" and has made the unfounded claims that there are no suitable conservators in New York. Plaintiff again reiterated that it does not authorize defendants to move the artworks to Chicago as they are fragile and irreplaceable.

17. To avoid irreparable harm, plaintiff Firestone respectfully requests that an order be issued immediately, barring the defendants from transferring the artworks outside of the New York metropolitan area, returning the Returnable Art and a certain Kenny Scharf mural to plaintiff at 4 Great Jones Street.

**18. There has been no prior application of the relief sought herein.**

WHEREFORE, it is respectfully requested that the relief set forth in the accompanying order to show cause be granted.

Dated: May 16, 2024
      New York, New York

                              Respectfully submitted,

                              MAZZOLA LINDSTROM, LLP

*[signature: Wendy J. Lindstrom]*

By:   Wendy J. Lindstrom
       1350 Avenue of the Americas, 2nd Floor
       New York, New York 10019
       646.216.8300
       wendy@mazzolalindstrom.com
       *Attorneys for Plaintiff Firestone Art, LLC*