# ART×LAW

2024-05-10

**BY ELECTRONIC MAIL:** wendy@mazzolalindstrom.com

Wendy Lindstrom, Esq.
Mazzola Lindstrom LLP
1350 Avenue of the Americas, Second Floor
New York, New York 10019

| | | |
|---|---|---|
| Re: | Insured: | Eric Firestone Gallery |
| | Policy No.: | PCFA-000033-01 |
| | Claim No.: | PHAR-23-004563 O/R 23-05725LQ |
| | Date of Loss: | On or about 2023-February-4 |
| | Location of Loss: | 4 Great Jones Street, New York, NY 10012 |

Dear Ms. Lindstrom:

Thank you for your letter of May 3rd. Not having had a reply to my letter to you of January 16th, I assumed and hoped that your team, the Insurer (Tokio Marine), and the Adjuster (Yorquest Associates) were working through the claim. Given the considerable number of artworks and what I have seen of the Insured's (Eric Firestone Gallery's) documents, it appears that you were pursuing an informal settlement-focused approach rather than the formal, "by the policy" approach that I outlined in my January 16th letter.

Based on your May 3rd letter and draft complaint, I infer that the settlement path, at least for now, has not been a success. I know the Adjuster and Insurer's team well enough to know that they are both practical, reasonable, and work in good faith. If the Insured and Insurer are more than $4,000,000 apart at this point, however, it is clear that the more-informal approach should be abandoned.

Rather than respond to the imputations of bad faith and other *ad hominem* in your letter (with which we disagree), or respond in kind regarding the Insured's approach, I have recommended, and the Insurer has agreed, that the parties should return to the "by the policy" process that was outlined some months ago. Under the current circumstances, there is no doubt that it will lead to the most expeditious and least costly (for both Insurer and Insured) processing and resolution of the claim. If, after all of the information and documents are provided and reviewed, there is still an issue as to what

2024-05-10
Wendy Lindstrom, Esq.
Page **2** of **5**

the Insurer is due, we can revisit both mediation and, if necessary, the Arbitration provided for in the Policy's General Conditions.

Putting aside the additional delay[1], expense, and other risks to the Insured (*e.g.*, if it is seeking payment for its loss of unearned and uninsured commissions on unsold artworks) if the Insured files the draft complaint you sent to us, it is unnecessary. There is no dispute that the Insured has claims insured by the Insurer arising out of loss and damage to its Covered Property, and that the Insurer intends to fund (*see* below re conservation/treatment) or pay the covered costs and loss in value arising out of the Insured's loss as set forth in the Policy. While it is also true, based on my limited review, it does appear that the Insured has provided "extensive supporting documentation" as alleged in its draft complaint, the Insurer has not (1) provided ***sufficient*** documentation for the Insurer to process the Claim or (2) made itself available for an Examination Under Oath as required by General Condition § 10(g) of the Policy and requested in my January 16th Letter.

Below is an outline of the steps that we believe are both required and, equally important, conducive to bringing the Insurer and the Insured expeditiously to either a voluntary agreement on the amount that the Insured and its consignees[2] are entitled to recover for their losses.

**BY THE INSURER**

1. **Furniture and Fixtures.** The Insurer will, despite some disagreement, pay the amount claimed by the Insurer for loss and damage to its furniture and fixtures.

2. **Undamaged Artworks**. Whatever was causing Crozier to withhold the release of undamaged artworks to the Insured has been resolved. The Insurer will instruct Crozier to comply with the reasonable requests of the Insured to deliver the

---

[1] Based on cases that our firm is handling in both federal and state courts, the adjudication of the motion to dismiss the complaint (if filed) could alone take more than a year during which, and in all events, your client would also be required to meet the obligations outlined in this letter pursuant to the terms of the Policy.

[2] *NB* that, under the circumstances, the Insurer is considering whether to exercise its privilege to adjust the claims of the owners (consignees) of some of the damaged artworks that are a significant part of the losses. (General Condition § 23.)

2024-05-10
Wendy Lindstrom, Esq.
Page **3** of **5**

undamaged artworks to its premises in the normal course and at the Insurer's expense. Any issues that may arise will be addressed directly by the Insurer via Mr. Quinn's instructions to Crozier.

3. **Conservation and Treatment of Damaged Artworks.** To address the concerns you expressed in your letter (without conceding the accuracy of your characterization of those concerns and claims), the Insurer is now arranging for the expeditious shipment of all damaged artworks (including those which, for settlement purposes, have been designated up to now as a total loss) to The Conservation Center in Chicago, a highly regarded firm that has the largest and most-comprehensive private art conservation laboratory in the United States. With its resources, we can expect that the conservation and treatment will be accomplished expeditiously. All of the treatment costs will be paid by the Insurer.

4. **Determination of Loss in Value for Damaged Artworks.** After The Conservation Center determines (whether before or after treatment) which artworks are total losses and which only sustained partial losses that were treated (or, perhaps, simply cleaned)[3], the Insurer will work expeditiously with a qualified appraiser to determine the loss in value (as provided by the Policy based on the applicable category—*e.g.*, owned by the Insured or owned/consigned by others), if any, of the damaged artworks. The Insurer will promptly notify the Insured of the loss in value that has been determined. If the Insured disagrees, the Insurer will first attempt to reach a settlement agreement with the Insured in good faith and, failing that, will consider mediation and, failing that, fully participate in, and follow, the arbitration process required by the Policy. (General Condition § 2.)

**BY THE INSURED**

1. **Inventory**. Without waiving the obligation to provide a signed Statement in Proof of Loss (General Condition § 10-h), the Insured should prepare and provide the

---

[3] *NB* that the loss in value, if any, cannot be determined until *after* the damaged artworks have been evaluated by a conservator and then treated or cleaned or, in the case of a total loss, deemed beyond conservation. The fact that the damaged artworks have not yet been treated/cleaned may account, in part, to the difficulties in reaching an informal settlement.

2024-05-10
Wendy Lindstrom, Esq.
Page **4** of **5**

Insurer with a complete inventory of the damaged and undamaged Covered Property. (Extensions of Coverage § 1.) The Insurer will pay up to $10,000 of the cost of preparing the Inventory. (*Id.*)

2. **Documentation**. For Covered Property that is damaged, the Insured should (i) specify whether it regards the Covered Property to be a total or partial loss, and (ii) identify the Covered Property as either "Owned by Insured" or "Owned and Consigned by Others." (Of course, if there are any other categories of damaged Covered Property, *e.g.*, property in the Insured's care but not consigned or property sold but not delivered, please have the Insured identify those as well.) The Insured should also make available records that relate to the Insured's claim, the loss, and the Policy (General Conditions §§ 10 and 11), including:

    a. For Covered Property owned by the Insured,

        i. records, including invoices, payment records, appraisals, and the like that document the cost of the Insured's acquisition of the owned Covered Property; and

        ii. records, including records required to comply with the "Truth in Pricing Law" that disclose the selling prices of the Covered Property;

    b. For Covered Property owned by others and consigned to the Insured,

        i. consignment or similar agreements and related documents that reflect the terms of the consignment, including the value of the consigned property and the amount(s) the consignors agreed to receive (which appears to vary somewhat by consignor) pursuant to the terms of the consignment however expressed (including, for example, a pre-loss, legally binding email exchange), including

            1. documents that we have seen in a number of the Insured's consignment agreements referred to as a "Schedule of Work and Prices" that the Insured agreed to provide to its consignors on an "ongoing" basis reflecting a "Minimum Sale Price agreed" by the Insured and the consignor;

            2. documents that relate to the amount that the consignors agreed to accept from the Insured in the event of loss or damage to the consignor's Covered Property;

2024-05-10
Wendy Lindstrom, Esq.
Page **5** of **5**

      ii. current contact information for the consignors if the Insurer determines that it will adjust the claimed loss(es) (General Condition § 23);

  c. Condition reports or other documents concerning the physical condition of Covered Property before and after occurrence giving rise to the Insured's claim; and

  d. Documentation, if any, relating to other insurance or agreements that may provide coverage or indemnity to the Insured for losses to Covered Property.

3. **Examination Under Oath.** Promptly after all of the documentation and information is received and reviewed by the Insurer and, if desired by the Insurer, audited (General Conditions §§ 10 and 11), Mr. Firestone will appear for an examination under oath to address any matters that are not clear from the documentation provided or relate to the Insured's claim.

For the benefit of your client, we note again that the Insured has a duty to "[c]ooperate with [the Insurer] in the investigation or settlement of the claim." (General Condition § 10(j).).

This letter is without prejudice to the Insurer's rights under the Policy and the governing law, all of which are expressly reserved.

I would be happy to discuss with you any of the matters raised above and recommend revisions if helpful. The Insurer's goal is simply to receive, review, and understand what is needed to process the claim and reach an agreement on payment with the Insured or, failing that, having the amount payable determined pursuant to the expedited dispute resolution process provided in the Policy.

Sincerely yours,

*JR Cahill*

John R. Cahill